**EMPIRE BANK, Plaintiff,**

v.

**FIDELITY & DEPOSIT COMPANY of MARYLAND, Defendant.**

No. 89-3242-CV-S-1.

United States District Court, W.D. Missouri, S.D.

July 30, 1993.

William Dalton, B. Clampett, Springfield, MO, for Empire Bank.

James McDaniel, St. Louis, MO, John Gibson, Kansas City, MO, for Fidelity & Deposit Co. of Maryland.

## ORDER AND MEMORANDUM OPINION

WHIPPLE, District Judge.

This action arises out of Plaintiff Empire Bank's ("Empire") claim under a banker's blanket bond issued to Empire by Defendant Fidelity & Deposit Company of Maryland ("Fidelity"). Empire seeks recovery under the bond for losses it sustained as a result of the illegal banking transactions of Trula and Randall Walker between 1982 and 1986. The bond insured Empire against certain types of losses discovered during the policy period of August 1, 1987 through August 1, 1988.

## I.  FACTS

Campbell 66 Express ("Campbell 66") was a large trucking company located in Springfield, Missouri. Frank Campbell founded the company and eventually retired from active participation in the business after promoting his son-in-law, Randall Walker, from treasurer to president of Campbell 66. As president, Randall Walker—in concert with his wife, Trula Walker—utilized several methods of diverting corporate funds from Campbell 66. Eventually, Campbell 66 instituted bankruptcy proceedings. The Campbell 66 bankruptcy trustee brought an adversarial proceeding against Empire arising out of the Walker's banking transactions at Empire. Empire agreed to pay Campbell 66 $208,735.30 in settlement of the bankruptcy adversarial proceeding. Empire seeks in this action to recover the amount paid in settlement to the bankruptcy trustee plus it's attorney fees.

## A.  TRULA WALKER'S CONDUCT

During the relevant time period Trula Walker used the corporate funds of Campbell 66 ostensibly to pay the salaries of her household employees. Trula Walker periodically telephoned the Campbell 66 bookkeeper and directed him to draw checks on the corporate funds deposited in the Commerce Bank of Springfield in specific amounts payable to her household employees. Trula Walker picked up the checks and, after endorsing the employee's names on the back of the checks, presented them for payment at the Glen Isle branch of Empire, requesting either cash or traveler's checks. One Empire teller testified that on one occasion she saw Trula Walker sign the name of the employees on the back of the checks. Other tellers testified that the endorsements were already present when Trula Walker would bring them to Empire. The tellers testified that Trula Walker refused to add her endorsement below the employee endorsement when requested. On each occasion, the teller inquired of her supervisor or directly to Frank Tucker, the Vice–President in charge of operations for Empire and Mr. Tucker would advise the employee to go ahead and cash the checks without Trula Walker's endorsement. Tucker's instructions were made known to the teller in charge of the Glen Isle branch and all the employees who worked there. All the employees who testified at trial or by deposition stated they were so instructed and that Trula Walker was the only customer of Empire permitted to cash third party checks without adding her endorsement. The Empire employees testified they knew it was against the policy and procedures of Empire to cash checks without the presenter's endorsement. Several of the employees expressed concern that they were breaking the law. The total amount of money obtained by Trula Walker in this manner between 1982 and 1986 was $47,734.00.

## B.  RANDALL WALKER'S CONDUCT

Between 1982 and 1985 Randall Walker took numerous customer checks payable to Campbell 66, endorsed them as an officer of Campbell 66 and cashed them at the main bank facility of Empire. Randall Walker took the checks to Floyd Tucker who approved Walker's request and instructed employees of the bank to cash the checks. Walker either requested cash or cashier checks made payable to him or Campbell 66. Campbell 66 had no corporate checking account or corporate payroll account at Empire. Campbell 66's business relationship with Empire consisted of a periodic payroll

withholding tax deposit and some certificates of deposit. The signature card for the certificates of deposit bore Randall Walker's name. No Campbell 66 corporate resolutions allowing Randall Walker to conduct any banking business outside the certificates of deposit were on file at Empire.

## C. BANK POLICIES AND PRACTICES

Empire set forth its standard operating policies and procedures in an employee manual. Empire required its employees to read and be familiar with the manual. All the employees who testified stated they knew the operating procedures and were familiar with the manual.

Empire required that all checks presented by a third party who requested cash must be endorsed by the third party before the third party received the cash. Empire also prohibited the cashing of any checks made payable to a corporation unless there was corporate resolution in Empire's *Bank Corporate Authorization Book* authorizing an officer to do so and there was a corporate signature card on file for the account. On January 10, 1985, Empire amended its operating policy to prohibit cashing any checks made payable to a corporation. Thereafter Empire required checks made payable to a corporation to be deposited in the corporation's account at Empire.

## II. EMPIRE'S CLAIMS

Empire is demanding reimbursement for the money paid in settlement of the demands of the Campbell 66 bankruptcy trustee plus its attorney fees. Empire is asserting coverage under the banker's blanket bond # 600 54 33-1 issued by Fidelity to cover losses discovered between August 1, 1987 and August 1, 1988. Empire asserts they gave notice to Fidelity in December 1987 after the bankruptcy trustee filed an adversary complaint against Empire on December 17, 1987.[1] Empire claims the losses were caused by false pretenses or forgery as provided in paragraphs (B) and (D) of the policy which state:

(B)(1) Loss of Property resulting directly from

(a) Robbery, burglary, misplacement, mysterious unexplained disappearance and damage thereto or destruction thereof; or

(b) theft, false pretenses, common-law or statutory larceny, committed by a person present in an office or on the premises of the insured, while the Property is lodged or deposited within offices or premises located anywhere.

\* \* \* \* \* \*

(D) Loss resulting directly from

(1) Forgery or alteration of, on or in the Negotiable Instrument (except an Evidence of Debt), Acceptance, Withdrawal Order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit.

(2) transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advice directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property which instructions or advice purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advice either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or banking institution. Telegraphic cable or teletype transmissions instructions or advice, as aforesaid, exclusive of electronic fund transfer systems, sent by a person other than the said customer or banking institution purporting to send such instructions or advice shall be deemed to bear a signature which is a Forgery. A mechanical reproduced facsimile signature is treated the same as a handwritten signature.

---

1. The bond covered losses *discovered* during the relevant period without regard to the date of the actual occurrence of the loss.

Forgery is defined in the "Conditions and Limitations" portion of the policy:

(i) Forgery means the signing of the name of another person or organization with the intent to deceive; it does not mean a signature which consists in whole or part of one's name signed with or without authority, in any capacity, for any purpose.

## III. CONCLUSIONS OF LAW

Empire's claim fails for three reasons. First, the conduct of the Walkers does not come under the terms of the bond. Second, Empire knew of the loss before the bond went into effect. Finally, the losses were caused by Empire's failure to comply with their own internal policies and accepted banking practices.

■ To make a prima facie case under an insurance agreement, Empire must establish five elements: (1) issuance of the policy of insurance; (2) delivery; (3) payment of the premium; (4) the loss through or on account of the cause insured against; and (5) the furnishing of notice and proof to the insurer as required by the policy. *Missouri Commercial Investment Company v. Employers Mutual Casualty Company*, 680 S.W.2d 397, 400 (Mo.Ct.App.1984); *Nixon v. Life Investors Ins. Co. of America*, 675 S.W.2d 676, 679 (Mo.App.1984). The insured has the burden of proving that the loss comes within the policy coverage and resulted from a covered peril. *Gibbar v. Calvert Fire Insurance Co.*, 623 F.2d 41, 44 (8th Cir.1980); *Simmons v. Orion Insurance Company*, 366 F.2d 572, 574 (8th Cir.1966); *Estrin Construction Co., Inc. v. Aetna Casualty & Surety*, 612 S.W.2d 413, 419 (Mo.App.1981).

■ The evidence established that Trula Walker endorsed the names of her household employees on checks drawn against Commerce Bank of Springfield and presented them for payment at Empire. The evidence also established that at least one Empire teller on one occasion watched as Walker signed the employee's name on the presented checks and accordingly was aware at the time of presentment that the checks bore forged signatures. Empire did not prove if the other tellers knew the employee's names were endorsed by Truly Walker at the time they cashed the checks. Moreover, Trula Walker always refused to add her endorsement to the checks. While the fact that Vice President Floyd Tucker instructed the tellers to "do whatever Trula wants," may relieve the tellers of any liability for cashing the third party checks, it should not—and does not—relieve Empire of the consequences of ignoring its own standard operating procedure and sound banking policy. The forged endorsements were not the reason that Empire suffered a loss; it was Empire's failure to follow their required procedures and good banking practice and insist upon Trula Walker's endorsements upon the checks.

■ Likewise, Empire's loss resulting from cashing the checks made payable to Campbell 66 at the request of Randall Walker do not come under the terms of the bond. First, there was no forgery by Randall Walker when he signed his own name to the checks as he was authorized to sign checks as an officer of Campbell 66. Forgery is defined under the terms of the bond to exclude "a signature which consists in whole or part of one's name signed with or without authority, in any capacity, for any purpose."

Second, Plaintiff presented no evidence that Randall Walker made any representation—whether true or false—to Tucker in an attempt to get the checks cashed. Walker was a former employee of Empire and a personal friend of Mr. Tucker. Tucker never questioned why Randall Walker was cashing the checks.

The losses suffered by Empire attributable to the conduct of Randall Walker were directly caused by ignoring the established policies of Empire which expressly prohibited: (1) the cashing of corporate checks in the absence of a corporate resolution in the Corporate Authorization Book to indicate what officers could act for the corporation; and (2) the cashing of corporate checks by an officer of a corporation at any time after January 10, 1985.

■ A bonding company issuing a banker's blanket bond must do so under the assumption that the bonded bank will follow

the procedures set forth in its own operations manual and operate in a commercially reasonable manner, conforming its conduct to reasonable commercial banking practices in compliance with the Articles of the Uniform Commercial Code covering banking practices (Chapter 400.3–101 through 400.5–117 R.S.Mo.1993). Empire's losses in this case were all caused by the intentional acts of an officer of Empire instructing employees to violate its prescribed procedures and reasonable commercial banking practices in order to accommodate the Walkers. Mr. Tucker was obviously currying favor with the Walkers in hopes of getting Randall Walker to move Campbell 66 banking business from Commerce Bank of Springfield to Empire. This type of irresponsible conduct is the type which has contributed to the banking crisis and resulted in the failure of so many banking institutions in the last several years.

■ The Court further finds that Tucker knew he was exposing Empire to subsequent losses at the time he authorized the cashing of the Walkers' checks and he had the responsibility to report to Federal immediately this known potential loss. All the checks were cashed before the bond went into effect and thus Empire's knowledge of the claims existed before this bond became effective on August 1, 1987.

Plaintiff contends the instant case is indistinguishable from *Jefferson Bank and Trust Company v. Central Surety and Insurance Corporation*, 408 S.W.2d 825 (Mo.1966). The Court does not agree. The *Jefferson* case occurred after Jefferson Bank had been found liable to a corporate depositor for allowing checks made payable to the corporation to be deposited in another account set up by a corporate officer. *Brede Decorating, Inc. v. Jefferson Bank & Trust Company*, 345 S.W.2d 156 (Mo.1961). Jefferson then sought indemnification from Central Surety under its bankers blanket bond. Unlike the instant case, in the underlying *Brede* case there was a corporate resolution authorizing the four corporate directors to sign checks and to endorse checks for deposit in the corporate account on file at Jefferson with accompanying signature cards. The evidence established that the corporate endorsement was stamped on the checks with a rubber stamp. Below that was the typed or written the words "Acme Williams Decorating Co." None of the checks bore any individual signatures. *Jefferson*, 408 S.W.2d at 828. The checks were then deposited in Acme Williams Decorating Co. account, an account set up secretly and used personally by a corporate officer and another employee. The issue was whether the endorsements were proper under the corporate resolution on file at Jefferson Bank. The Missouri Supreme Court ruled they were not and reasoned that the improper endorsements should have placed Jefferson on notice to inquire whether the corporate officer was authorized to so endorse checks payable to the corporation and deposit them in another account.

In the instant case Randall Walker was a proper endorser, and he did not endorse the checks to deposit in another account but rather to receive either cash or a cashiers check; Campbell 66 had no checking account at Empire; Campbell 66 had no signature card on file for a corporate checking account and no corporate resolution in Empire's Corporate Resolution Book. In the instant case, there is no question that Empire had notice that the Walkers were improperly cashing Campbell 66 checks. There was not even a pretense that the Walkers' conduct was proper, only that it would be tolerated regardless of propriety. Tucker, an officer of Empire authorized and assisted Randall and Trula Walker in cashing the Campbell 66 checks. Empire presented no evidence that Tucker relied on any misrepresentation or nondisclosure in cashing the checks. Under these facts Empire cannot present even a colorable claim of lack of notice when it in fact assisted in the acts it now seeks recovery for. Empire received notice that the Walkers were improperly utilizing corporate funds each time Tucker authorized what he knew to be improper transactions. Tucker knew that Campbell 66 could demand Empire reimburse it for the money he allowed Randall Walker to divert for his own use each time he assisted Randall Walker.

Inasmuch as Empire had actual notice before the issuance by Fidelity of the banker's

**680**

blanket bond of the improper use of corporate funds by the Walkers in violation of reasonable banking practices and Empire's own procedures and in violation of reasonable banking practices at the time each check was cashed, Empire is precluded from recovery.

IT IS THEREFORE ORDERED that judgment shall be entered for defendant and against plaintiff.